IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> JUAN ANTONIO VASQUEZ, <br> AKA Juan Antonio Vazquez, <br> AKA Albert Baron <br><br> Defendant. | ORDER AND MEMORANDUM DECISION <br><br><br><br><br> Case No. 2:06-cr-196 TC |

Police discovered narcotics in Defendant Juan Antonio Vasquez's car after stopping him for failure to maintain a lane of travel early on March 24, 2006.  The United States indicted Mr. Vasquez for knowing and intentional possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine with an intent to distribute in violation of 21 U.S.C. § 841(a)(1).  Before the court are two evidentiary motions submitted by Mr. Vasquez.

First, Mr. Vasquez has filed a Motion to Strike Testimony (dkt. # 29) of a police officer and sheriff's deputy.  He argues their testimony is inconsistent with testimony provided by other officials in another case regarding similar training programs.  The court DENIES this motion because Mr. Vasquez's argument goes to the witnesses' credibility which the court considers in findings of fact.

Second, Mr. Vasquez has filed a Motion to Suppress Evidence (dkt. #11).  Arguing the search and seizure violated his Fourth Amendment rights, Mr. Vasquez seeks to exclude

evidence of contraband uncovered during a search of his car.  The court finds the police stopped

Mr. Vasquez after he violated traffic laws, did not unreasonably prolong the detention, and had

probable cause prior to the search.  His motion to suppress is also DENIED.

## FINDINGS OF FACT

At approximately 1:15 a.m. on March 24, 2006, Cedar City Police Officer Jason Thomas

received a phone call from a Nevada drug interdiction agent whom he previously knew.  (Tr. at

45:21-46:5, 82:24-83:4.)[1]  The agent informed Officer Thomas that the Nevada drug interdiction

team stopped Mr. Vasquez's car[2] and observed "a lot of indicators" of narcotics trafficking, but

did not mention any of the indicators.  (Id. at 46:8-10, 83:5-6.)  Without a canine available, the

Nevada team allowed Mr. Vasquez to leave since he refused consent to a search of the vehicle.

(Id. at 47:14-16.)  After letting Mr. Vasquez go, the Nevada team learned he was on a DEA

watch list for drug trafficking.  (Id. at 47:10-12.)  Accordingly, the Nevada agent gave Officer

Thomas the make, model and license plate number of Mr. Vasquez's car.  (Id. at 46:23-25.)

Officer Thomas called Iron County Sheriff's Deputy Jeff Malcolm to relay the

information received from the Nevada agent.  (Id. at 6:12-16.)  At approximately 3:45 a.m.

Deputy Malcolm headed towards mile post 51 on Interstate-15 ("I-15") and pulled off the

freeway to speak with Officer Thomas about Mr. Vasquez.  (Id. at 7:5-12.)  As Deputy Malcolm

pulled back onto the freeway, he noticed an automobile driving next to a semi-truck, moving at

---

[1]All transcript citations refer to the Evidentiary Hearing for Mr. Vasquez's Motion to Suppress, held on August 28, 2006.

[2]For clarity, the court refers to the car as "Mr. Vasquez's" solely to reflect he was in possession of the car and he was the driver.  The court does not suggest or imply any ownership or legal right for Mr. Vasquez, particularly because it is undisputed the vehicle was registered to another person.

about the same speed as the truck.  (Id. at 7:22-25, 8:1-5.)  Finding it strange that the car drove

next to the truck, Deputy Malcolm decided to follow the vehicle.  (Id. at 9:6.)  Once he caught up

to the car, he noticed it was the make and model of the car the Nevada agent described and

suspected it was Mr. Vasquez.  (Id. at 9:710:1.)  As Deputy Malcolm started to call the license

plate in to his dispatcher, he observed the car cross the center line without signaling, and drift

more than a foot into the Deputy's lane of traffic.  (Id. at 10:7-10, 10:13-14.)  The Deputy

radioed Officer Thomas to ask how to proceed and turned on his video camera to record the

pursuit.  (Id. at 11:2-6, 11:9-10.)  With the camera recording, the Deputy watched Mr. Vasquez

cross the traffic lines two additional times even though the road was fairly straight and the

weather was good.  (Id. at 11:2-11, 56:8-10; Deputy Malcolm's Videotape of the Stop,

Government's Exhibit 2 ("Exh. 2").)  Upon Officer Thomas's recommendation, the Deputy

pulled the vehicle over for failure to maintain lane of travel.  (Tr. at 11:12-18.)  Once the cars

stopped, the Deputy called the license plate numbers into the dispatcher.  (Exh. 2.)

Deputy Malcolm walked up to find Mr. Vasquez alone in his car.  (Tr. at 12:2-21.)

Remaining in his vehicle, Mr. Vasquez rolled down the passenger window and Deputy Malcolm

explained why he stopped Mr. Vasquez.  (Id. at 11:24-12:1.)  When Deputy Malcolm asked Mr.

Vasquez for his license, registration, and insurance, Mr. Vasquez explained he had received a

citation in Illinois and the state kept his license until he paid the fine.  (Id. at 13:2-6.)  In lieu of a

license, Mr. Vasquez gave Deputy Malcolm an identification card and the Illinois citation with

his driver's license number on it,[3] as well as the car's registration card.  (Id. at 14:18-15:18; Exh.

---

[3]There is no evidence in the record whether the Illinois citation served as a valid driver's license.  Accordingly, the court reserves judgment on this fact.

2; Officer Thomas's Videotape of the Stop, <u>Government's Exhibit 1</u> ("Exh. 1").)  Mr. Vasquez

did not provide proof of insurance.[4]  (Tr. at 15:16-17.)

Asking standard traffic questions from outside the passenger door, the Deputy thought

Mr. Vasquez answered very quickly, as though his answers were rehearsed.  (<u>Id.</u> at 16:6-9.)

While asking these traffic questions, Deputy Malcom also observed several indicators of

potential drug trafficking.  (<u>Id.</u> at 13:7-20.)  Specifically, he noticed an air freshener in the car, a

laptop computer placed on the front passenger seat, a suit hanging in the back window, and Mr.

Vasquez's early morning time of travel.  (<u>Id.</u>)  While conceding that these items in isolation are

innocent, Deputy Malcom testified the combination of all of these factors, along with his eight

years of experience and training, aroused his suspicion.  (<u>Id.</u> at 13:21-14:12.)  But the Deputy

never asked about any of the items to see if Mr. Vasquez had a legitimate explanation for them.

(<u>Id.</u> at 31:2-20.)  With Mr. Vasquez's citation and identification, as well the registration for the

car he was driving, the Deputy returned to his car and waited for Officer Thomas to arrive.  (<u>Id.</u> at

16:13-17.)

Within a couple minutes, Officer Thomas joined Deputy Malcom in the Deputy's car.

(Exh. 2.)  The two discussed a strategy for questioning Mr. Vasquez and the Deputy handed Mr.

Vasquez's documents to Officer Thomas to take over the investigation.  (<u>Id.</u>; Tr. at 16:22-25.)

As a canine officer, Officer Thomas goes to work every day with Gino, a trained and certified

five year-old male Belgian Malmois.  (Tr. at 44:3-8.)  Consequently, Officer Thomas arrived

with his dog in tow.  (<u>Id.</u> at 49:22-23.)

---

[4]There is no evidence that the Deputy asked for the insurance again or that the Deputy
realized at the time Mr. Vasquez had failed to provide proof of insurance.

A little more than four minutes after Mr. Vasquez was initially stopped, Officer Thomas approached Mr. Vasquez's vehicle without his dog.  (Exh. 2; Exh. 1.)  Through the open passenger window, Officer Thomas invited Mr. Vasquez to the Officer's car while he wrote up the warning.  (Tr. at 55:1-21; Exh. 1.)  Officer Thomas explained he preferred to speak in his police car to avoid making several trips between the cars and to assess if Mr. Vasquez appeared impaired.  (Tr. at 55:1-21; Exh. 1.)  While standing outside Mr. Vasquez's car, Officer Thomas observed several indicators of narcotics trafficking.  (Tr. at 50:14-19.)  Namely, the Officer noticed a single key on the keychain in the car's ignition, two cans of Red Bull energy drink, the laptop computer on the front passenger seat, the suit hanging in the back, the cleanliness of the car despite the length of the journey, and the absence of luggage in the automobile.  (Id. at 50:14-19, 52:22-53:14.)  Factoring in the information from the Nevada agent, the early morning time of travel, the fact that I-15 is a known drug corridor, and his eight years of experience and training, Officer Thomas became suspicious that Mr. Vasquez was trafficking narcotics.  (Id. at 52:5-19.)

Mr. Vasquez joined Officer Thomas in the Officer's car and explained he crossed the traffic lines because it was windy and because his car has small tires.  (Id. at 55:22-56:7, 71:11-15.)  He also provided Officer Thomas the same explanation about the Illinois citation he provided to Deputy Malcolm.  (Id. at 56:22-57:2.)  While the Officer wrote out the traffic warning, he ran a background check which revealed a criminal history of cocaine trafficking.  (Id. at 57:15-20, 102:18-23; Exh. 1.)

After additional questioning, Mr. Vasquez said he traveled to Las Vegas to see his children and had stayed with his uncle.  (Tr. at 59:7-8, 58:4-22.)  Coming from Normal, Illinois, where he owned an auto repair business, Mr. Vasquez borrowed his girlfriend's car because it is

more fuel efficient than his own car.  (Exh. 1.)  The car he was driving was registered in

Tennessee to Melissa B. Shoup.  (Tr. at 61:7-11.)  When asked for his girlfriend's name, he

immediately responded "Melissa Brooke Shepherd."  (Exh. 1; Tr. at 60:1-3.)  Asked to repeat

himself, Mr. Vasquez stated the name again, but then misspelled her first name using only one

"s."  (Exh. 1; Tr. at 62:5-12.)  He also did not seem to recall where his girlfriend worked,

contemplating the question for a long time before finally answering he believed she was between

jobs.  (Exh. 1; Tr. at 62:19-20.)  When Officer Thomas hinted the registered owner was not the

person Mr. Vasquez had identified, Mr. Vasquez said the owner's "last name might be Shoup"

because "she could have used her maiden name."  (Exh. 1; Tr. at 86:8-25.)  Mr. Vasquez told the

Officer he had Ms. Shoup's phone number in his cell phone, which was back in his own car.  (Tr.

at 64:19-65:6.)

        Based on Mr. Vasquez's difficulty recalling details about his girlfriend and the error

identifying the name of the registered owner, Officer Thomas became concerned about the

vehicle's legal ownership, in addition to concerns about other criminal activity.  (Id. at 63:4-13.)

Accordingly, Officer Thomas asked if Mr. Vasquez had any weapons, cocaine, heroin or

methamphetamine in the car.  (Id. at 64:2-8.)  Mr. Vasquez answered each in the negative, but

manifested a different reaction to the question about methamphetamine.  (Id.)  This anxious

reaction increased Officer Thomas's suspicion of narcotics trafficking.  (Id.)

        At that point—approximately nineteen minutes after the initial stop—Officer Thomas

stopped questioning Mr. Vasquez and asked for consent to search the vehicle.  (Id. at 64:9-13;

Exh. 2.)  Although Mr. Vasquez refused consent, Officer Thomas explained Gino was going to

sniff around the car while Deputy Malcolm tried to identify the owner.  (Tr. at 64:9-13, 65:15-18,

66:4-7.) Mr. Vasquez retrieved his cell phone to get the get the owner's phone number. (Id. at 66:4-7.) Officer Thomas gave the paperwork to Deputy Malcolm to investigate the vehicle's ownership while the Officer walked Gino to Mr. Vasquez's car. (Id. at 65:20-66:7.)

Approximately twenty-two minutes after Mr. Vasquez was initially stopped, Gino started performing a drug sniff of the car. (Exh. 2.) Changing his sniffing pattern and body behavior, Gino alerted to the back of the car. (Tr. at 66:23-25, 67:4-14; Exh.1; Exh. 2.) He also alerted to the front bumper. (Tr. at 66:24-25.) While sniffing around the car, Gino jumped in through the passenger window Mr. Vasquez left open after speaking with Deputy Malcolm. (Id. at 68:3-17; Exh. 1.) Once in the vehicle, Gino aggressively alerted to the back seat. (Tr. at 68:3-17; Exh. 1.)

Officer Thomas then advised Mr. Vasquez that they were going to search the vehicle for narcotics. (Tr. at 72:12-16.) When Mr. Vasquez asked if they had a warrant, Officer Thomas explained Gino's hits gave them probable cause to search the vehicle without a warrant. (Id.) After opening the trunk, Officer Thomas commented on the intense odor of motor oil, often used to mask the smell of narcotics. (Id. at 73:6-18; Exh. 1.) The police continued to search the vehicle by the side of the road, but did not find any narcotics. (Tr. at 73:15-25, Exh. 1; Exh. 2.) The search included Mr. Vasquez's duffel bag found in the trunk, but still uncovered no contraband. (Exh. 1; Exh. 2.) After searching the vehicle for approximately thirteen minutes, Officer Thomas decided to take the car to the sally port[5] for a more in-depth search of the vehicle under better light. (Exh. 1; Exh. 2.) Deputy Malcolm provided Mr. Vasquez a ride to the sally port. (Exh. 1; Exh. 2.)

---

[5]As explained at the hearing, the sally port is behind the Sheriff's Office and there is a lobby between the Highway Patrol and Sheriff's Office. (Tr. at 37:16-20.)

The police discovered contraband after searching for approximately thirty minutes at the sally port.  (Tr. at 19:17-21:6, 36:10-11.)  In front of the front passenger tire, Deputy Malcolm found a plastic box covered with an overspray substance usually used to combat rust.  (<u>Id.</u>)  After drilling the box and removing it from the vehicle, the police found methamphetamine.  (<u>Id.</u>)  Mr. Vasquez was subsequently arrested and taken to jail and his car was sent to a local tire mechanic shop for additional searching.  (<u>Id.</u> at 76:7-14, 76:22-25.)

## ANALYSIS

### <u>Motion to Strike Testimony</u>

Because Mr. Vasquez's motion to strike testimony addresses only the credibility of the witnesses, the court finds the motion improper.  He asks the court strike the credible testimony of Deputy Malcolm and Officer Thomas because their "testimony is directly controverted by other sworn testimony of a Highway Patrol Trooper" in another case.  (Def.'s Mem. Supp Motion to Strike, at 2 (dkt. #30).)

The court does not find striking competent testimony as the appropriate resolution of credibility.  Mr. Vasquez was given the opportunity to cross-examine these witnesses and challenge their veracity during the evidentiary hearing.  Accordingly, the court considered Mr. Vasquez's arguments when assessing the credibility of the witnesses to make its findings of fact.

Mr. Vasquez's Motion to Strike Testimony (dkt. #29) is DENIED.

### <u>Motion to Suppress Evidence</u>

Mr. Vasquez also asks the court to suppress evidence seized from his vehicle arguing the warrantless search and seizure violated the Fourth Amendment protections "against unreasonable searches and seizures."  U.S. Const. amend. IV.  To determine if the evidence should be

suppressed, the court considers: (1) Mr. Vasquez's standing to challenge the search and seizure; and (2) whether the search and seizure was unreasonable under the Fourth Amendment.

## I.   <u>Standing</u>

Before considering the alleged constitutional violation, the court must determine whether Mr. Vasquez has standing to seek protection under the Fourth Amendment. Standing is a threshold inquiry because Fourth Amendment rights "cannot be vicariously asserted." <u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000). To determine if a defendant has standing to challenge a search, courts must determine "whether a challenged stop and search violated the Fourth Amendment rights of a criminal defendant making the challenge." <u>United States v. Erwin</u>, 875 F.2d 268, 270 (10th Cir. 1989).

Notably, a defendant bears the burden of showing he satisfies the standing requirements. <u>Allen</u>, 235 F.3d at 489 ("[I]n order for a defendant to show such an expectation of privacy in an automobile, the defendant bears the burden at the suppression hearing to show a 'legitimate possessory interest in or [a] lawful control over the car.'") (quoting <u>United States v. Gama-Bastidas</u>, 142 F.3d 1233, 1239 (10th Cir 1998)). For vehicular searches, "[w]here the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest . . . ." <u>United States v. Valdez Hocker</u>, 333 F.3d 1206, 1209 (10th Cir. 2003). Although "a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself," <u>id.</u>, he "must at least state that he gained possession from the owner or someone with authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445 (10th Cir. 1990).

Courts consider three factors to determine if a defendant satisfied his burden.  Namely, "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."  Allen, 235 F.3d at 489.  Under this standard, when a defendant "claim[s] that he personally obtained possession from the registered owner . . . he would 'plainly ha[ve] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.'"  Valdez Hocker, 333 F.3d at 1209 (quoting United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990)).

The first two factors cut strongly against Mr. Vasquez's standing to challenge the constitutionality of the search and seizure.  He did not assert ownership of the narcotics seized or testify at the evidentiary hearing.[6]  But Mr. Vasquez told the police that Ms. Shoup—his girlfriend—loaned him her car.  Although not offered by the defense, this evidence shows Mr. Vasquez claimed a legitimate possessory interest in the car.  And no evidence disputes Ms. Shoup as the legal owner or contradicts Mr. Vasquez's relationship with Ms. Shoup.

But this circuit has not determined whether the government's evidence that the defendant

---

[6]Notably, the Tenth Circuit has explained that a defendant can testify freely at an evidentiary hearing for a motion to suppress without forfeiting his rights against self-incrimination:

> [T]he Supreme Court held that a defendant's testimony at a suppression hearing to establish standing to object to a search cannot be used against him at trial to establish guilt because otherwise, the defendant would be required to choose between the Fourth Amendment right to be free from unreasonable searches and the Fifth Amendment right against self incrimination.

United States v. Hardwell, 80 F.3d 1471, 1483 (10th Cir. 1996).

claimed legitimate possession of the car at the time of the search—and the government did not disprove that claimed interest—is sufficient to satisfy standing.  As discussed in more detail below, the court need not determine Mr. Vasquez's standing because there was no Fourth Amendment violation.  See, e.g., United States v. Orendain, No. 98-4113, 188 F.3d 520, at *3 n.1 (10th Cir. July 22, 1999) ("Because we find no Fourth Amendment violation even assuming Orendain has standing to challenge the search of the truck, we decline to address the standing issue."); United States v. Perez, No. 96-1216, 145 F.3d 1347, at *1 n.1 (10th Cir. Apr. 20, 1998) ("This court need not address the government's argument that Defendant has no standing to challenge the searches because we find that, even assuming Defendant does have standing, the search warrants were valid.").

The court assumes, without deciding, that Mr. Vasquez has standing to challenge the search and seizure of the vehicle.

## II.    **The Search and Seizure**

To determine whether Mr. Vasquez's Fourth Amendment rights were violated, the court must consider the reasonableness of: (A) the initial stop; (B) the ongoing detention; and (C) the search and seizure of the vehicle.  Because all three were reasonable, the court finds no constitutional violation.  Mr. Vasquez's Motion to Suppress Evidence (dkt. #11) is DENIED.

## A.    **The Initial Stop Was Reasonable**

The initial stop was reasonable under the Fourth Amendment because Deputy Malcolm had reasonable suspicion of a traffic violation when he stopped Mr. Vasquez's car.  A traffic stop is a seizure and must satisfy the reasonableness requirements of the Fourth Amendment.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1257 (10th Cir. 2006) ("A traffic stop is a Fourth

Amendment seizure 'even though the purpose of the stop is limited and the resulting detention quite brief.'") (quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979)).  Under the principles of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Fourth Amendment requires "a law enforcement officer 'must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile.'"  <u>United States v. Alvarado</u>, 430 F.3d 1305, 1308 (10th Cir. 2005) (quoting <u>United States v. Cervine</u>, 347 F.3d 865, 869 (10th Cir. 2003)).  But if there is reasonable suspicion of a traffic violation, it matters not "'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.'"  <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (quoting <u>United States v. Ferguson</u>, 8 F.3d 385, 391 (6th Cir. 1993)).

Utah traffic laws require "[a] person operating a vehicle shall keep the vehicle as nearly as practical entirely within a single lane . . . ."  Utah Code Ann. § 41-6a-710.  The Tenth Circuit determined it is reasonable to stop a car for violating this statute when "there were no adverse weather or road conditions that might have made it impractical for [the defendant] to prevent his vehicle from drifting out of [his] lane."[7]  <u>Alvarado</u>, 430 F.3d at 1309.

In this case, Deputy Malcolm offered compelling and credible testimony he observed Mr. Vasquez cross the traffic lines on three occasions.  (Tr. at 41:9-16.)  Therefore, the Deputy had reasonable suspicion to stop Mr. Vasquez's vehicle.  This reasonable suspicion is supported by

---

[7]The <u>Alvarado</u> court considered a different section of the Utah Code than the violation in this case, but this is exclusively a result of renumbering code sections.  <u>Alvarado</u>, 430 F.3d at 1306 n.1 ("Although it has no relevance to our analysis in this case, we note that in 2005, Utah Code Ann. § 41-6-61 was renumbered and amended by changing its wording to active voice. See Utah Code Ann. § 41-6a-710(1)(a). We refer herein to the provision as it existed at the time of the vehicle stop in question.").  Because the pertinent language is identical, the court refers to the Tenth Circuit's analysis.

Mr. Vasquez's admitting to Officer Thomas he crossed the traffic lines.  (Id. at 56:2-4.)
Although Mr. Vasquez initially blamed his small tires and the wind, he has not offered any
evidence of severe conditions to undermine the reasonableness of the initial stop.  (Id.)  The court
finds the initial stop reasonable under the Fourth Amendment.

**B.     The Continued Detention Was Reasonable**

The court considers the reasonableness of Mr. Vasquez's continued detention in three
phases: (1) Officer Thomas's reasonable suspicion; (2) Officer Thomas's additional questioning;
and (3) Gino's drug sniff.  The court finds each phase reasonable under the Fourth Amendment.

1.     Officer Thomas Had Reasonable Suspicion of Narcotics Trafficking

Because Deputy Malcolm and Officer Thomas had reasonable suspicion of a crime
beyond the traffic violation, continued detention was reasonable under the Fourth Amendment.
Although the initial stop was reasonable, any continued detention must be reassessed under the
Fourth Amendment.  United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2005) ("A driver
must be permitted to proceed after a routine traffic stop if a license and registration check reveal
no reason to detain the driver unless the officer has reasonable articulable suspicion of other
crimes or the driver voluntarily consents to further questioning.").  "A seizure that is justified
solely by the interest in issuing a warning ticket to the driver can become unlawful if it is
prolonged beyond the time reasonably required to complete that mission."  Illinois v. Caballes,
543 U.S. 405, 407 (2005).  But police may prolong the initial detention with either valid consent
or with reasonable suspicion of criminal activity.  Alcaraz-Arellano, 441 F.3d at 1259 ("The
additional questioning could be justified if the encounter at this point was consensual or if
prolongation of the stop was supported by reasonable suspicion.") (citations omitted).

13

Because Officer Thomas had reasonable suspicion of narcotics trafficking approximately four minutes after the initial stop, the continued detention was reasonable.[8]  (Exh. 2; Tr. at 50:14-19, 52:22-53:14.)  Evaluating reasonable suspicion, "we must examine the totality of the circumstances, meaning that reasonable suspicion may exist even if 'each of the[ ] factors alone is susceptible of innocent explanation.'"  United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000) ("[E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity . . . .").  When considering the facts arousing suspicion, the court must "avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'"  United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995), cert. denied, 517 U.S. 1143 (1996)).

Affording even minimal deference to Officer Thomas's relevant experience and training, the court finds he had a reasonable and articulable suspicion of narcotics trafficking after speaking with Mr. Vasquez through the passenger window.  Specifically, Officer Thomas

_____

[8]Mr. Vasquez could not validly consent to additional detention, so any prolonged detention must be supported by reasonable suspicion of criminal activity.  This circuit "'follow[s] the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to her.'"  United States v. Guerrero-Espinoza, 462 F.3d 1302, 1308-09 (10th Cir. 2006) (quoting United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005)) (footnote omitted).  Here, it is undisputed the Illinois citation and identification were not returned to Mr. Vasquez.  (Tr. at 99:8-10, 105:6-9.)  He could not consent to additional questioning.

considered that the DEA named Mr. Vasquez on a drug trafficking watch list,[9] Mr. Vasquez was

driving on a known drug corridor at a time of day drug traffickers tend to travel,[10] he

conspicuously displayed a laptop on the passenger seat and a suit hanging in the back,[11] the

keychain in the ignition had just the single car key,[12] and Mr. Vasquez kept two cans of Red

Bull,[13] all while driving an exceptionally clean car registered in another state to another person,

without any luggage inside the vehicle.  (Tr. at 50:11-53:17.)  Relying on his eight years of

experience, as well as his significant training, Officer Thomas reasonably considered the totality

of these facts to believe Mr. Vasquez may have been trafficking narcotics before Mr. Vasquez

was asked a single question peripheral to the traffic stop.  After evaluating the circumstances, the

court agrees these factors add up to reasonable suspicion Mr. Vasquez was involved in narcotics

trafficking less than five minutes from the initial traffic stop.

---

[9]The Tenth Circuit has found a DEA warning can be a factor considered for reasonable suspicion.  United States v. Stone, 866 F.2d 359, 362 (10th Cir. 1989) (finding reasonable suspicion based only on "the presence of the Patchouli oil . . . used in California, mainly to cover up the smell of marijuana" and "that [the DEA] suspected Stone of being involved in a cocaine smuggling ring and that he associated with people who were known methamphetamine dealers.").

[10]Officer Thomas testified "I-15 is a large drug corridor" and narcotics traffickers tend to travel at extremely early or late hours of the day "when they think law enforcement may not be out on the freeway."  (Tr. at 52:5-10, 16.)

[11]Officer Thomas testified the laptop and suit were indicators because they were conspicuously displayed, and a little curious given Mr. Vasquez's profession.  (Tr. at 53:6-8, 59:10-17.)

[12]Officer Thomas testified a single key is in indicator because it allows criminals to "disassociate that car from themselves." (Tr. at 50:23-51:6.)

[13]Officer Thomas testified that the Red Bull cans were indicators because "people involved in criminal activity don't like to stop," so "they use the energy drink to stay awake." (Tr. at 51:14-20.)

Considering all of these factors in the totality of the circumstances, the court finds Officer Thomas had objectively reasonable and articulable suspicion that Mr. Vasquez was involved in criminal conduct.  Based on this reasonable suspicion alone, the Fourth Amendment allows Officer Thomas to prolong Mr. Vasquez's detention beyond the time needed for the initial stop.

2.     Additional Questioning Was Reasonable

Additionally, Officer Thomas's questioning while writing up the warning added to the reasonable suspicion without unreasonably prolonging the stop.  The Tenth Circuit recently explained police can ask questions unrelated to the stop—even without reasonable suspicion of criminal activity—as long as the questioning does not unreasonably extend the initial seizure. United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) ("As long as the trooper's questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions.").  Having ruled the initial stop valid, "[t]he correct Fourth Amendment inquiry . . . is whether an officer's traffic stop questions 'extended the time' that a driver was detained, regardless of the questions' content."  United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007).

There is no precise length of time that is reasonable to issue a traffic warning, but this case falls well within the realm of reasonableness.  For example, the Tenth Circuit recently ruled asking questions while writing a speeding ticket did not unreasonably extend the detention when the stop lasted only eighteen minutes.  United States v. Yeomans, No. 06-1037, 2007 WL 30032, at *5 n.9 (10th Cir. Jan. 5, 2007).  The circuit also found nineteen minutes to issue a warning reasonable because "there was no evidence in the record that [the policeman] was stalling in the performance of these routine tasks."  United States v. Briseno, 163 Fed. Appx. 658, 664 (10th

Cir. 2006).

Similarly, Officer Thomas completed his questioning approximately nineteen minutes after the initial stop, asking questions as he filled out Mr. Vasquez's warning.  (Tr. at 56:6-13; Exh.1; Exh. 2.)  There is no evidence the Officer stalled.  Rather, while asking questions, Officer Thomas ran a background check on Mr. Vasquez which revealed a criminal history of narcotics trafficking.  (Tr. at 57:11-20.)  The Officer also became concerned about the legal ownership of the vehicle because Mr. Vasquez had difficulty identifying the registered owner.  (Id. at 63:4-13.) This concern increased after Mr. Vasquez struggled to state the job of the registered owner, who was allegedly his girlfriend of four years.  (Id. at 60:1-3, 63:4, 102:24-103:3.)  Officer Thomas also relied on his extensive police experience to detect Mr. Vasquez's heightened anxiety when questioned about methamphetamine.  (Id. at 63:25-64:8.)  As Officer Thomas credibly testified, this only supported his already reasonable suspicion.  (Id.)

Because Officer Thomas uncovered all of this information while filling out paperwork and completed his questioning within nineteen minutes of the initial stop, his questions did not unreasonably prolong Mr. Vasquez's detention.  It does not matter that Officer Thomas asked questions about narcotics unrelated to the stop.

     3.    <u>Gino's Sniff Was Reasonable</u>

Additionally, the Fourth Amendment allows the dog sniff because Officer Thomas had reasonable suspicion of narcotics trafficking.  When the government has a reasonable suspicion of narcotics trafficking, the Fourth Amendment allows a dog sniff even if it prolongs the

detention.[14]  See Wallace, 429 F.3d at 976.

As discussed above, Officer Thomas considered several factors which lead to a reasonable and articulable suspicion of drug trafficking.  Although each factor independently is insufficient for a reasonable suspicion, Mr. Vasquez's trouble answering questions about the car's owner and his purported girlfriend, his criminal history of narcotics trafficking, his heightened anxiety when asked about methamphetamine, in addition to all of the indicators Officer Thomas initially observed and his training and experience, adds up to reasonable suspicion.

Because he had reasonable suspicion, the Fourth Amendment allowed Officer Thomas to extend the original detention for a few minutes to perform a drug sniff.  See Alcaraz-Arellano, 441 F.3d at 1259.

Ultimately, because the duration of the detention was not unreasonably extended, and

---

[14]Additionally, Gino's sniff is reasonable under the Fourth Amendment because it did not unreasonably extend Mr. Vasquez's detention.  As the Supreme Court recently explained, the use of a drug sniffing dog during a traffic stop does not require reasonable suspicion as long as the traffic stop is not unreasonably extended.  Caballes, 453 U.S. at 410 ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.").  Similarly, Gino's drug sniff started merely twenty-two minutes after the initial stop, likely within the realm of reasonableness for a traffic stop as previously explained.  (Exh. 1; Exh. 2.)

Moreover, Officer Thomas had reasonable suspicion that the vehicle was stolen to justify additional inquiry, and the drug sniff occurred during this additional inquiry.  (Tr. at 63:4-13.)  As he explained to Mr. Vasquez, the Officer felt he had a duty to investigate the legal ownership of the vehicle because Mr. Vasquez had difficulty properly identifying the owner.  (Exh. 1; Tr. at 63:4-13.)  Accordingly, Mr. Vasquez retrieved his cell phone to get the owner's phone number and Officer Thomas asked Deputy Malcolm to investigate the car's legal ownership.  (Tr. at 66:4-7.)  With Deputy Malcolm handling the investigation, Officer Thomas brought Gino to Mr. Vasquez's car to sniff the car for drugs.  (Tr. at 66:8-11.)  Because the drug sniff was done concurrently with the investigation of ownership, the drug sniff did not extend Mr. Vasquez's detention and did not infringe Mr. Vasquez's Fourth Amendment rights.

because the police had reasonable suspicion of criminal activity, the continued detention did not

violate Mr. Vasquez's Fourth Amendment rights.

**C.      The Search and Seizure of the Car Was Reasonable**

Because Gino's alert established probable cause, the Fourth Amendment allows the

search of Mr. Vasquez's car, including transporting the vehicle to the sally port.  "Under the

automobile exception, a warrantless search is permissible if there is probable cause to believe

that the vehicle contains contraband."  United States v. Chatman, 994 F.2d 1510, 1514 (10th Cir.

1993).  A positive drug dog alert satisfies probable cause and allows a search of the entire

automobile, including all containers within the car.  California v. Acevedo, 500 U.S. 565, 580

(1991) ("The police may search an automobile and the containers within it where they have

probable cause to believe contraband or evidence is contained."); United States v. Williams, 403

F.3d 1203, 1207 (10th Cir. 2005) ("A canine alert gives rise to probable cause to search a

vehicle."); United States v. Rosborough, 366 F.3d 1145, 1153 (10th Cir. 2004) ("[W]e hold that a

canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk

as well.").  Probable cause also allows the police to move the car to another location to continue

a search.  Alcaraz-Arellano, 441 F.3d at 1261 (After satisfying probable cause, "transportation of

the car to the sheriff's department and subsequent search was therefore lawful.").

Here, Gino's positive alert gave police the probable cause needed to search the entire

vehicle, to search the duffel bag in the trunk, and to move the car without a warrant.  And with

probable cause to search the vehicle after Gino's first alert, there is no Fourth Amendment

violation simply because Gino subsequently jumped into the vehicle.[15]  Accordingly, the search

and seizure of Mr. Vasquez's car did not violate the Fourth Amendment.

      Because the search and seizure was reasonable under the circumstances, Mr. Vasquez's

Motion to Suppress Evidence (dkt. #11) is DENIED.

## ORDER

      For the foregoing reasons, Mr. Vasquez's Motion to Strike Testimony (dkt. # 29) and

Motion to Suppress Evidence (dkt. #11) are DENIED.

      DATED this 15th day of March, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

---

[15]Moreover, the Tenth Circuit found no Fourth Amendment violation when a dog entered a vehicle because there was no evidence "the police asked [the defendant] to open the [car] so the dog could jump in. . . . [or] evidence the police handler encouraged the dog to jump in the car." United States v. Stone, 866 F.2d 359, 364 (10th Cir. 1989).  Similarly, Gino jumped in through the window Mr. Vasquez left open after speaking with Deputy Malcolm and there is no evidence Officer Thomas encouraged Gino to enter the vehicle.